# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
RICHARD T. DAHL,

                Petitioner,

v.

SECRETARY OF HEALTH
AND HUMAN SERVICES,

                Respondent.
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

No. 13-98V

Special Master Christian J. Moran

Filed: April 2, 2014

Motion to exclude expert witness.

Sheila Ann Bjorklund, Lommen Abdo Law Firm, Minneapolis, MN, for petitioner.
Julia W. McInerny, United States Dep't of Justice, Washington, DC, for respondent.

## RULING DENYING MOTION TO EXCLUDE EXPERT TESTIMONY[1]

On October 8, 2013, petitioner, Richard Dahl, moved to exclude respondent's expert, Dr. Gerald Raymond. Mr. Dahl contends that a conflict of interest requires Dr. Raymond's disqualification. Dr. Raymond is currently the head of the hospital unit where Mr. Dahl sought treatment for his alleged vaccine injury. Mr. Dahl argues that Dr. Raymond's position in the department where Mr. Dahl sought treatment and the potential for Mr. Dahl to seek treatment from Dr. Raymond in the future requires the disqualification of Dr. Raymond as respondent's expert.

During the time Mr. Dahl was treated at the hospital, Dr. Raymond was neither a member of the medical staff nor a member of the faculty of the affiliated

---

[1] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this order on its website. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

university.  Mr. Dahl is unable to show that a confidential or privileged relationship existed between himself and Dr. Raymond.  Additionally, Mr. Dahl cannot show Dr. Raymond was in possession of privileged information as a result of a confidential relationship.  Consequently, it is not appropriate to exclude Dr. Raymond's expert testimony for failing to comport with the American Medical Association Code of Medical Ethics ("Code of Medical Ethics") or any comparable standard.  Therefore, the motion is denied.

**I.      Relevant Medical History**

Before his alleged vaccine injury, Mr. Dahl's medical history included several significant medical events, including a 2010 diagnosis of leukodystrophy.  Exhibit 14 at 44-57.  Leukodystrophy encompasses various types of neurodegeneration in cerebral white matter.  Dorland's Illustrated Medical Dictionary 1029 (32d ed. 2012).  One subset of regressive leukodystrophy common in young people is vanishing white matter disease, which can cause stiffness and spasticity of the limbs and optic atrophy.  Id. at 544.

After his leukodystrophy diagnosis, Mr. Dahl received the flu vaccine on November 2, 2011.  Exhibit 2 at 1.  By December 28, 2011, Mr. Dahl was unable to walk.  Exhibit 15 at 139.  On January 1, 2012, he was admitted to North Memorial Medical Center ("North Memorial").  He was discharged from North Memorial with a diagnosis of Guillain-Barré syndrome ("GBS") on January 10, 2012.  Id. at 148; exhibit 5 at 159.

Throughout 2012, Mr. Dahl received a variety of different diagnoses for the cause of his persistent ailments, including GBS, leukodystrophy, or a combination of both.  See generally exhibits 5–20.  Most of these visits are not relevant to the petitioner's motion.

For purposes of Mr. Dahl's motion, the important appointments occurred at the University of Minnesota – Fairview Medical Center and Amplatz Children's Hospital ("FMC").  Exhibit 8 at 1–54.  Neurologists Dr. Brandon Peters and Dr. Peter Karachunski treated him, starting on April 30, 2012.  Id.  Dr. Peters' assessment, with which Dr. Karachunski agreed, was that Mr. Dahl's symptoms, such as loss of reflexes, were consistent with leukodystrophy.  Id. at 9. Dr. Peters did not make a diagnosis of GBS.  Id.  Dr. Karachunski separately stated that diagnostic results were inconsistent with GBS and he ordered genetic tests.  Id. at 14–15.  On June 20, 2012, genetic test results were positive for childhood ataxia with CNS hypomyelination/vanishing white matter disease (CACH/VWM), a

subtype of leukodystrophy, and Dr. Karachunski confirmed this diagnosis on June 22, 2012.  Id. at 23, 53.

Mr. Dahl last sought treatment from Dr. Karachunski at the pediatric neurology practice group at FMC on August 7, 2012.  Pet'r's Reply at 3; exhibit 8 at 59.  Mr. Dahl states he was last treated at FMC for pain management in October 2012.  Pet'r's Reply at 3.  Dr. Raymond, respondent's expert, joined FMC in December 2012.  Exhibit B at 2.  Dr. Karachunski updated Mr. Dahl's records in February 2013.  Pet'r's Reply at 3.

## II.     Procedural History

On February 5, 2013, Mr. Dahl filed a petition for compensation under the National Vaccine Injury Compensation Act, 42 U.S.C. § 300aa-10 through 34 (2012) ("Vaccine Act" or "Program").  Mr. Dahl alleged that the flu vaccine he received on November 2, 2011, caused him to suffer GBS.  The flu vaccine is listed in the Vaccine Injury Table as a vaccine covered by the Vaccine Act.  See 42 C.F.R. § 100.3(a).

With his petition, Mr. Dahl filed medical records, which he supplemented later.  Exhibits 1-22.  On June 25, 2013, respondent reviewed the medical records and stated her position that compensation under the Program is not appropriate because Mr. Dahl has not demonstrated by preponderant evidence that the flu vaccine caused his illness.  Resp't's Rep't.

During a July 16, 2013 status conference, the Secretary identified Dr. Raymond, a specialist in leukodystrophy, as her expert.  Respondent filed Dr. Raymond's expert report (exhibit A) on September 27, 2013.  According to Dr. Raymond, Mr. Dahl suffered from a subset of leukodystropy, CACH/VWM.  This illness, Dr. Raymond contends, was not caused or affected by the flu vaccine.  See exhibit A at 9.

On October 8, 2013, Mr. Dahl filed a motion to exclude Dr. Raymond as respondent's expert, arguing Dr. Raymond's position at FMC where Mr. Dahl had been treated created a conflict of interest.  Pet'r's Mot. to Exclude.  On November 8, 2013, the Secretary filed a response to Mr. Dahl's motion, arguing that no conflict of interest exists.  Resp't's Resp.  On November 15, 2013, Mr. Dahl filed a reply in support of his motion to exclude.  Pet'r's Reply.  This issue is ready for adjudication.

## III.    Standard for Disqualifying an Expert Based Upon a Conflict of Interest

Neither the Vaccine Act nor the Vaccine Rules set forth a standard for special masters to follow in determining whether a conflict of interest precludes the presentation of a particular expert's opinion.  Likewise, the Rules of the Court of Federal Claims and the Federal Rules of Civil Procedure do not address this topic.  In absence of this guidance, case law should be consulted.

The most useful case is Hanlon v. Sec'y of Health & Human Servs., 191 F.3d 1344 (Fed. Cir. 1999), a case involving tuberous sclerosis.  In that case, the petitioners objected to the Secretary's retention of a doctor who was the foremost expert in tuberous sclerosis, because he had testified on behalf of other petitioners with tuberous sclerosis whom the Hanlons' attorney represented.  The special master permitted the Secretary to retain the doctor.  See Barnes v. Sec'y of Health & Human Servs. No. 92–0032V, 1997 WL 620115, at *1-5 (Fed. Cl. Spec. Mstr. Sept. 15, 1997) (allowing the doctor's testimony), aff'd sub nom. Hanlon, 191 F.3d 1344.

At the Federal Circuit, the petitioners maintained that the special master erred in not excluding respondent's expert's opinion.  The Federal Circuit observed that Congress delegated to special masters "wide discretion with respect to the evidence they would consider."  Hanlon, 191 F.3d at 1349–50 (quoting Whitecotton v. Sec'y of Health & Human Servs, 81 F.3d 1099, 1108 (Fed. Cir. 1996)).  The Federal Circuit held disqualification is not required "unless it is reasonable to conclude that the expert possessed confidential information that would prejudice the petitioner."  Id.[2]

The Court of Federal Claims interpreted and followed Hanlon in Return Mail, Inc. v. United States, 107 Fed. Cl. 459, 461 (2012).  In Return Mail, the United States Postal Service moved to exclude a retired postal executive as the opposing party's expert because the expert's former position made him privy to privileged information at the center of the litigation.  Id. at 461–62.

The Court of Federal Claims stated where an expert witness switches parties during a legal proceeding, that expert must be disqualified.  Return Mail, Inc., 107 Fed. Cl. at 461.  In all other circumstances, determining whether an expert should

---

[2] As a decision from the Federal Circuit, Hanlon is precedent that binds judges and special masters of the Court of Federal Claims.

be disqualified requires affirmative answer to two questions. First, did the expert witness and the party requesting disqualification have a confidential relationship? And second, in the course of that relationship did the moving party "disclose any privileged or confidential information relevant to the proceeding?" Id.[3] The court denied the motion, as the United States Postal Service did not show that the expert had access to specific information nor did it produce any document showing the expert was present when privileged or confidential information was discussed. Id. at 463–68.

## IV.   The Parties' Arguments

Neither party cited Hanlon or Return Mail in their briefs and therefore the parties did not phrase their arguments with reference to Hanlon or the Return Mail two-part test. Nevertheless, their arguments implicitly touch on the basic inquiries.

Mr. Dahl argues that Dr. Raymond's participation as respondent's expert means a conflict of interest exists because Dr. Raymond possesses confidential information about Mr. Dahl's health and will offer an opinion adverse to Mr. Dahl's case. Mr. Dahl raises several broad arguments for excluding Dr. Raymond as an expert. The first three attempt to establish the existence of a confidential relationship between Dr. Raymond and Mr. Dahl.

First, Mr. Dahl points out that he was treated by Dr. Karachunski in the Pediatric Neurology department at FMC. Pet'r's Mot. to Exclude at 2. After Mr. Dahl was last treated by Dr. Karachunski, Dr. Raymond joined the practice group and is now a colleague of Dr. Karachunski. Id. Because Dr. Raymond is a part of the Neurology Clinic, Mr. Dahl contends that the conflict which would preclude Dr. Karachunski from testifying is imputed to Dr. Raymond, even though Dr. Raymond was not employed at FMC at the time. Id. at 3–4. Mr. Dahl argues that the Code of Medical Ethics requires that Dr. Raymond be disqualified from testifying, as specialty and group medical practices treat the patients of the group as patients of each individual doctor in that group. Id. at 3.

---

[3] The Court of Federal Claims has articulated a third factor, which is considered when the two questions addressed above are answered in the affirmative. In circumstances in which there are few knowledgeable experts willing to testify, the scales would tilt in favor of denying disqualification. Return Mail, 107 Fed. Cl. at 461–69 (declining to address the third factor, as the answers to the first two questions were negative).

5

Second, Mr. Dahl also argues that Dr. Raymond's position at FMC is similar to the other situations requiring disqualification. Id. at 4–6. Mr. Dahl's second argument analogizes the current situation to insurance administrators who determine eligibility under ERISA and to the attorney-client privilege. See id. Mr. Dahl argues that Dr. Raymond simultaneously received money from respondent for his expert testimony and from Mr. Dahl's insurance company for his treatment, raising the specter of impropriety. Id. at 7; Pet'r's Reply at 5.

Third, Mr. Dahl argues for disqualification based on potential future events. In his original motion, Mr. Dahl states "it is entirely foreseeable that Petitioner will be under the direct care of Dr. Raymond at some time." Pet'r's Mot. to Exclude at 3. In his reply, Mr. Dahl explains that he might return to FMC and have future interactions with Dr. Raymond. Pet'r's Reply at 4, 6. Mr. Dahl, relying on the Code of Medical Ethics, claims that because of these potential future interactions, Dr. Raymond is required to recuse himself and, his having failed to do this, should result in his disqualification. Pet'r's Mot. to Exclude at 4.

For the second question of Return Mail – the disclosure of confidential information – Mr. Dahl relies on Dr. Raymond's access to both Mr. Dahl's previous treating physician and Mr. Dahl's files. Mr. Dahl argues that Dr. Raymond, in his position at FMC, "is in possession of confidential information that is potentially extremely prejudicial to petitioner's vaccine claim." Pet'r's Mot. to Exclude at 6–7. In his reply, Mr. Dahl contends that Dr. Raymond "has free and open access to all of the physicians/staff/providers who participated in [Mr. Dahl's] care." Pet'r's Reply at 2–3. Additionally, Mr. Dahl argues "it is not without possibility for Dr. Raymond to, even in passing, inquire of these [FMC] personnel their experience with [Mr. Dahl] and pass that along to [r]espondent." Pet'r's Reply at 3.

Respondent argues that Dr. Raymond was not employed at the FMC when Mr. Dahl sought treatment. Resp't Resp. at 2–7. As a result, Mr. Dahl was not a patient of Dr. Raymond and could not have been a treating physician within the meaning of the Medical Code of Ethics. Id. at 3. Respondent further states, that if Dr. Raymond were considered a treating physician, his exclusion would not be mandated by the Code of Medical Ethics because Dr. Raymond's opinion is not adverse to Mr. Dahl's medical, as opposed to legal, interests. Id. at 5–6. Respondent states that Dr. Raymond never saw or was consulted by Dr. Karachunski about Mr. Dahl's care, condition, or treatment. Id. at 2. Respondent states Mr. Dahl did not produce any records showing treatment by Dr. Karachunski at FMC since August 7, 2012, and no physical therapy or pain management

6

treatments in 2013. Id. As a result, respondent argues there is not a conflict of interest as Mr. Dahl cannot show Dr. Raymond acted inconsistently with the Code of Medical Ethics. Id. at 7–8.

## V. Discussion

To establish whether Dr. Raymond should be disqualified, Mr. Dahl must demonstrate that he and Dr. Raymond had a confidential relationship and, if a confidential relationship existed, that Mr. Dahl disclosed confidential or privileged information to Dr. Raymond. Mr. Dahl has not shown that he and Dr. Raymond had a confidential relationship. As such, he cannot show he disclosed any confidential information to establish that Dr. Raymond must be disqualified.

### A. Is There a Confidential Relationship between Mr. Dahl and Dr. Raymond?

Mr. Dahl's first argument is based on the concept of imputation of a confidential relationship – when Dr. Raymond joined the practice group, he took on the same obligations owed to Mr. Dahl by Dr. Karachunski. Mr. Dahl primarily argues that the Code of Medical Ethics requires disqualification. Pet'r's Mot. to Exclude at 3. The relevant portion of the Code of Medical Ethics states: "the physician must hold the patient's medical interests paramount."[4] In Mr. Dahl's view, Dr. Raymond is breaching his ethical obligation by presenting an opinion (that Mr. Dahl's ailments were caused by leukodystrophy (not the flu vaccine) and that Mr. Dahl does not have GBS) that is inconsistent with Mr. Dahl's legal claim (that the flu vaccine caused or worsened Mr. Dahl's health). Pet'r's Mot. to Exclude at 3–4, 6; Pet'r's Reply at 4. Mr. Dahl cites no cases in support of the claim that the Medical Code of Ethics requires disqualification of Dr. Raymond.

The cases interpreting the Code of Medical Ethics distinguish a person's litigation interests from his or her medical interests. The Code of Medical Ethics declaration that the physician must hold the patient's medical interests paramount does not "impose a duty to loyalty upon a physician not to disagree with the patient's litigation position." In re Zimmer Nexgen Knee Implant Prod. Liab.

---

[4] Opinion 9.07 - Medical Testimony, AMA: American Medical Association (Dec. 2004), http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion907.page.

Litig., 890 F. Supp.2d 896, 908 (N.D. Ill. 2012) (quoting In re Pelvic Mesh/Gynecare Litig., 43 A.3d 1211, 1218 (N.J. Super. Ct. App. Div. 2012)). Indeed, a physician is obligated to cooperate fully in litigation. Id.; see Opinion 9.07 ("As citizens and professionals with specialized knowledge and experience, physicians have an obligation to assist in the administration of justice.").

A determination of whether a patient's litigation and medical interests overlap is "a matter of professional judgment by the treating physician, not by the patient's lawyers, or by the courts applying wholesale rules of prohibition and disqualification." In re Zimmer, 890 F. Supp.2d at 908–09; In re Pelvic Mesh, 43 A.3d at 1224. Even if Dr. Raymond treated Mr. Dahl, then it is Dr. Raymond's decision whether, in his honest assessment, the medical interest of his patient "permits expert assistance and testimony adverse to [Mr. Dahl's] litigation interests." In re Pelvic Mesh, 43 A.3d at 1224 (internal quotation marks omitted).

Mr. Dahl's second argument, focusing on conflicts of interest in the ERISA field or general monetary conflicts, supposes money is received from two opposing sources, creating a conflict. For example, in Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008), the United States Supreme Court noted that this type of conflict exists when an ERISA plan administrator monetarily benefits from denying a claim. Id. at 112. ("Every dollar spent in benefits is a dollar spent by the employer; and every dollar saved is a dollar in the employer's pocket."). However, the situation of an ERISA planner, who benefits monetarily when denying payments, and Dr. Raymond, who is being paid to offer his opinion about a matter, are too different for adequate comparison.

Regarding attorney-client privilege, a wide number of courts have rejected the application of attorney-client privilege to other conflicts of interests. E.g., Kendall Coffey, Inherent Judicial Authority and the Expert Disqualification Doctrine, 56 Fla. L. Rev. 195, 202–07 (2004) (discussing expert disqualification doctrine development since the influential holding in Paul v. Rawlings Sporting Goods Co., 123 F.R.D. 271, 278 (S.D. Ohio 1988), which rejected comparing the attorney-client privilege to other situations).

Mr. Dahl's third argument for disqualification is based on potential future events. Mr. Dahl, relying on the Code of Medical Ethics, claims that these potential future interactions require Dr. Raymond to recuse himself and, having failed to do this, that he be disqualified. See Pet'r's Mot. to Exclude at 4.

The Code of Medical Ethics states "when treating physicians are called upon to testify in matters that could adversely impact their patients' medical interests, they should decline to testify unless the patient consents or unless ordered to do so by legally constituted authority." Opinion 9.07. The language of the Code of Medical Ethics Opinion 9.07 looks back in time, protecting a "patient the physician has treated" or "when called upon to testify in matters that could adversely impact their patients." Opinion 9.07 (emphasis added). The AMA Council's report,[5] providing commentary on this standard, notes that a doctor should decline to testify in "legal proceedings involving a current patient." Id. It does not inquire into future doctor-patient relationships, but only current or past relationships.

Mr. Dahl last sought treatment from Dr. Karachunski at the neurology practice group at FMC on August 7, 2012. Pet'r's Reply at 3. Mr. Dahl states the last time anyone at FMC treated him was in October 2012. Pet'r's Reply at 4. Dr. Raymond joined FMC on December 31, 2012. Exhibit B at 2. After that date, the only activity undertaken by the neurology clinic group concerning Mr. Dahl was basic record-keeping and did not involve Dr. Raymond. See Pet'r's Reply at 4 (explaining that in February 2013. Dr. Karachunski received information from the Courage Center clinic, which was then placed in the Mr. Dahl's medical file). As Dr. Raymond's employment at FMC and Mr. Dahl's treatment occurred at separate times, Dr. Raymond could not have treated Mr. Dahl, and disqualification is not required for this reason.[6]

In sum, Dr. Raymond's expert opinion should not be excluded. It is generally the decision of a treating physician to decide if the medical and litigation interests of a patient overlap. Additionally, the Code of Medical Ethics does not bar the testimony of a doctor who may treat a litigant in the future, nor do other standards. As a confidential relationship did not exist, it is not possible for privileged information to have been disclosed.

---

[5] Michael S. Goldrich, Report of The Council on Ethical and Judicial Affairs, AMA: American Medical Association 6 (2004), http://www.ama-assn.org/resources/doc/code-medical-ethics/907a.pdf.

[6] Additionally, disqualification is not a mandated remedy. As respondent correctly states, the Code of Medical Ethics specifies when a treating doctor and patient are placed in adversarial legal positions, it "may be appropriate for a treating physician to transfer the care of the patient to another physician." Opinion 9.07.

### B. Has Dr. Raymond Acquired Any Confidential Information from Mr. Dahl?

Even assuming a confidential relationship, the second question in the two-part test is whether Dr. Raymond obtained any confidential information that would prejudice Mr. Dahl.  See Return Mail, 107 Fed. Cl. 459, 461 (2012) (stating disqualification is not required unless information relevant to the proceeding was obtained in the course of the confidential relationship).  To show Dr. Raymond possessed privileged information, Mr. Dahl must offer some specifics about disclosure of relevant privileged information.  See id. at 465.

Mr. Dahl makes several statements about Dr. Raymond's access to confidential information.  As the Secretary identified, Mr. Dahl seems to suggest that Dr. Raymond used patient information that Mr. Dahl did not consent to release as part of this litigation.  Resp't's Resp. at 2 n.3.  Dr. Raymond's affidavit states he reviewed only the "provided records" for Mr. Dahl.  See exhibit D at 1.

When Mr. Dahl submitted the medical records pertinent to this litigation, he waived the confidentiality of those records as far as the parties and their experts are concerned.[7]  Mr. Dahl is obliged to provide "all available medical records supporting the allegation in the petition, including physician and hospital records."  Vaccine Rule 2(c)(2)(A); accord 42 U.S.C. § 300aa-11(c)(2).  Mr. Dahl has injected his medical condition and its possible causes into this case.  He cannot reasonably claim that his filed records are privileged such that they could not be analyzed by the undersigned or respondent

Mr. Dahl cannot offer any specifics about the disclosure of privileged information to Dr. Raymond beyond that he was employed by an organization that possesses privileged information.  Mr. Dahl states only that Dr. Raymond could possibly acquire such information.  For instance, Mr. Dahl argues that Dr.

---

[7] Although, conceivably, Dr. Raymond could access the medical practice's files, these files should replicate the material produced in the litigation.  Mr. Dahl's submission of exhibit 1-21 has waived the confidentiality of that information as far as the parties (and their associated experts) are concerned.  See Fisher v. Sw. Bell Tel. Co., 361 F. App'x 974, 978 (10th Cir. 2010) (stating "a plaintiff waives the [doctor-patient] privilege by placing his or her medical condition at issue") (quoting Schoffstall v. Henderson, 223 F.3d 818, 823 (8th Cir. 2000)); Batiste-Davis v. Lincare, Inc., 526 F.3d 377, 381 (8th Cir. 2008) (stating a party waives confidentiality of prior treatment of a condition when condition is at issue); Doe v. Oberweis Dairy, 456 F.3d 704, 717 (7th Cir. 2006) (stating when a party places a physiological state at issue, opposing party is entitled to discovery of all records of that state).

Raymond "can" discuss an opinion about causation with Mr. Dahl's treating physician and Dr. Raymond "can" pass along confidential discussions to respondent.[8]  Pet'r's Mot. to Exclude at 6.  This vagueness undermines much of Mr. Dahl's argument.  Without any specifics, it is easy to blur the distinction between privileged and non-privileged information.  While communications between a doctor and patient are generally privileged, see Jaffee v. Redmond, 518 U.S. 1, 9-12 (1996), Mr. Dahl has waived this privilege at least as far as the Secretary and experts she has retained are concerned.  Thus, the Secretary's retention of Dr. Raymond afforded him access to Mr. Dahl's medical records, regardless of whether Dr. Raymond worked at an institution that created some of those records.  Simple access to written medical records cannot be a basis for disqualification.

### VI.    Conclusion

As Mr. Dahl and Dr. Raymond did not have a confidential relationship and Dr. Raymond did not receive privileged information, Mr. Dahl's Motion to Exclude Respondent's Expert is **DENIED**.  Dr. Raymond's expert testimony remains in the record.  A status conference is scheduled for **Wednesday, April 30, 2014 at 3:30 P.M. Eastern Time.**  The Office of Special Masters will initiate the call.

Any questions may be directed to my law clerk, Mary Holmes at 202-657-6353.

**IT IS SO ORDERED.**

s/Christian J. Moran
Christian J. Moran
Special Master

---

[8] To the extent that Mr. Dahl asserts that medical personal who treated Mr. Dahl would orally convey some information about Mr. Dahl that the provider did not include in the written records, this argument seems far-fetched.  It seems very doubtful that a busy doctor or staff member would (a) observe something special about Mr. Dahl, (b) not have memorialized that significant observation, and (c) remember the important, but unrecorded, observation to tell Dr. Raymond.